IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILADELPHIA MARINE** | : | **CIVIL ACTION** |
| **TRADE ASSOCIATION/** | : | |
| **INTERNATIONAL** | : | |
| **LONGSHOREMEN'S** | : | |
| **ASSOCIATION VACATION** | : | |
| **FUND, et al., O'NEILL** | : | |
| **CONSULTING CORPORATION,** | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| Defendant. | : | **No. 04-4857** |

Gene E.K. Pratter, J.       Memorandum and Order       July 17, 2006

The parties to this case, which involves a request for a refund of tax penalty payments, have filed cross-motions for summary judgment.  For the reasons that follow, the motion of the United States of America will be granted, the motion of the Plaintiffs will be denied and judgment will be entered in favor of the United States of America.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Philadelphia Marine Trade Association/Int'l Longshoremen's Fund (the "Fund") is a multi-employer trust fund organized under Section 501 of the Internal Revenue Code that is funded by contributions made pursuant to the collective bargaining agreements between the Philadelphia Marine Trade Association and various local unions of the International Longshoremen's Association.  <u>Plaintiffs' Memorandum in Support of Summary Judgment</u> at 1. The Fund pays out monies twice annually to bargaining unit employees of member-employers for whom funds have been paid pursuant to the Philadelphia Marine Trade Association's collective bargaining agreements with the Int'l Longshoremen's Association that represents the employees.

Id. O'Neill Consulting Corporation ("O'Neill") is a third party administrator for the Fund to handle the day-to-day management and administrative servicing of the Fund. Id. at 2. O'Neill, a family-owned consulting business, was responsible for calculating and remitting taxes to the Internal Revenue Service on behalf of the Fund. Id.

On June 25, 2001, the Commissioner levied upon $ 160,386.48 held by the Fund in a money market account at PNC Bank.[1] The levy was taken on account of penalties assessed for failing to electronically remit taxes for the Fourth Quarter of 1999 and the Second and Fourth Quarters of 2000. The existence of the levy was not discovered until the summer of 2002, when Anthony Pontarelli, CPA , was hired by O'Neill to audit the books and records of the Funds. Plaintiffs' Memorandum in Support of Summary Judgment at 3. Mr. Pontarelli apparently noticed the levy listed as a balance sheet item and began to investigate it. Mr. Pontarelli discovered the nature of the debit when, on or about April 12, 2003, he obtained a copy of a debit recording slip from PNC Bank.

Mr. Pontarelli informed Susan O'Neill, president of O'Neill, about the levy and, on May 7, 2003, they together placed a call to Revenue Officer James Dugan of the Internal Revenue Service. The parties are in dispute as to what was said during the course of this conversation. Plaintiffs assert that Mr. Dugan informed them that the levy was related to tax payments for the Fourth Quarter of 1999 and the Second and Fourth Quarters of 2000 and advised them to send a copy of the levy and all corresponding Forms 941 and Schedule B to his attention. The United

---

[1] The amount, date and reason for the levy are undisputed, as is the fact that the amount of the penalty represented 10% of the total taxes not remitted electronically. United States' Response to Plaintiffs' Motion for Summary Judgment at 3. However, the United States asserts that the time at which Plaintiffs learned of the levy is unknown.

States asserts that Mr. Dugan does not recall explaining the reason for the levy or requesting any information from Plaintiffs.

Plaintiffs assert that subsequent to the May 7 telephone call, Mr. Pontarelli drafted a letter (the "May 8 Letter") to Mr. Dugan for signature by himself and Susan O'Neill and on behalf of Philadelphia Marine Trade Association. Pontarelli Dep. at 46:5-21. In the May 8 Letter, Mr. Pontarelli stated that "[w]e believe that the assessment of a federal tax deposit penalty was made in error" and requested that the matter be reopened for further investigation. May 8 Letter. Mr. Pontarelli further stated that "[g]iven the above we believe that a refund will be due to the fund and request this petition for a refund be processed at your earliest opportunity."[2] May 8 Letter. Mr. Pontarelli testified that he personally faxed the May 8 Letter to Ms. O'Neill, and Ms. O'Neill testified that she received and immediately signed it and sent it via United States Postal Service Overnight Mail to Mr. Dugan. Pontarelli Dep. at 45:13-21; O'Neill Aff. at ¶ 6. However, Ms. O'Neill cannot provide a proof of mailing of the May 8 Letter and because the postage was paid through a meter at O'Neill's office and there is no separate billing record to support this assertion. O'Neill Aff. at ¶ 7.

Ms. O'Neill further asserts that later in May of 2003 she telephoned Mr. Dugan and that

---

[2] The United States points to an inconsistency in the May 8 Letter, in that Mr. Pontarelli referred to the quarterly federal tax returns for "both quarters in question" as opposed to the three quarters that were originally in dispute. United States' Opposition to Plaintiffs' Motion for Summary Judgment at 5. While the United States is correct in this observation, the tax returns that were attached to the May 8 Letter were returns for the Fourth Quarter of 1999 and the Fourth Quarter of 2000. O'Neill Aff. at Ex. A. The penalty that was refunded to Plaintiffs represented the levy attributable to the Second and Fourth Quarters of 2000 (denying refund of the Fourth Quarter of 1999 penalty because the Form 941 was allegedly not timely filed). O'Neill Aff. at ¶ 17. To the extent that the May 8 Letter can be construed as a request for a refund, it appears that the quarterly payment in dispute was included in that letter.

3

he told her he had not yet had an opportunity to review the file, and that she followed up her telephone call with another letter to Mr. Dugan dated June 13, 2003 (the "June 13 Letter"), the postage of which was also affixed by a metering machine in O'Neill's office. O'Neill Aff. at ¶ 8. Contrary to the Plaintiffs' recollection, Mr. Dugan testified that he only recalled receiving the original telephone call from Mr. Pontarelli and Ms. O'Neill and the subsequent meeting with them, and he did not recall whether he received the May 8 Letter or the June 13 Letter.[3] Dugan Dep. at 19:13-17; 32:16-22; 33:19-24; 37:6-7.

Plaintiffs next assert that in late June of 2003, Mr. Pontarelli received two voicemail messages from Mr. Dugan. The first message allegedly informed Mr. Pontarelli that the file had been reviewed and that Mr. Dugan would process the appeal and obtain a refund for the Fund. Pontarelli Dep. at 52: 7-18; 55:7-10. In the second message, Mr. Dugan allegedly stated that the refund would not be immediately forthcoming because the matter was more complicated than he anticipated. Pontarelli Dep. at 53:1-6. Mr. Pontarelli and Ms. O'Neill each further allege that they continued to be in contact with Mr. Dugan during July of 2003, and that during the latter part of July, they first learned that the penalties giving rise to the levy were not for late payments or missing schedules but rather were penalties assessed because the taxes had not been electronically filed. Pontarelli Dep. at 62:1-24; 63:1-13; O'Neill Aff. at ¶ 10.

The parties agree that a meeting was held in August of 2003 to discuss the matter, and

---

[3] Mr. Dugan testified that because the tax penalty had been paid in full at the time the original call was made, the file was closed and he would not have had a paper file folder in which to house any subsequent letters, if they were received. Dugan Dep. at 19:23-24; 20:1-6. Mr. Dugan also speculated that the letters, if they were sent at all, would have to have been sent prior to his receiving the original phone call inquiring about the penalties; otherwise, he would have kept the letters had he received them. Dugan Dep. at 37:23-24; 38:1-2.

that the meeting was attended by Mr. Dugan, Allison Sigler, who operated as a "trouble shooter" for the Commissioner, Mr. Pontarelli and Thomas McGoldrick, counsel for O'Neill and that Ms. Sigler and Mr. Dugan could not refund the monies at the meeting but provided Plaintiffs with a "formal form 843." O'Neill Aff. at ¶ 13; United States Statement of Disputed Facts at ¶ 10.

On September 15, 2003, Mr. McGoldrick filed, on behalf of O'Neill and the Fund,[4] a Form 843 (requesting a refund) accompanied by a nine-page letter explaining why a refund was appropriate. O'Neill Aff. at Ex. D. In response, the Commissioner granted the Fund a partial refund in the amount of $93,365.61, representing the portion of the levy, together with interest, attributable to the Second and Fourth Quarters of 2000.[5] On March 4, 2004, O'Neill filed a formal appeal of the denial of the refund with respect to the Fourth Quarter of 1999. O'Neill Aff. at Ex. D. By letter dated July 12, 2004, the Commissioner denied the appeal for the tax period ended December 31, 1999 because, pursuant to IRS regulations, the request for a refund had to have been filed within two years from the date the penalty was paid. O'Neill Aff. at Ex. E. In summary, the Internal Revenue Service denied the request to refund the penalty for the Fourth

---

[4] A "Power of Attorney and Declaration of Representative" form, which conferred a limited power of attorney upon Mr. McGoldrick on behalf of the Fund, was attached to the claim.

[5] The entire levy appears to have been taken on the same day, June 25, 2001. The Internal Revenue Code provides that the time limit for filing a claim or refund is "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." 26 U.S.C. § 6511(a). If no return was filed by the end of the tax period, the time limit is 2 years from the time the tax was paid. Id. Thus, it appears that returns must have been filed after September 15, 2003 (the date of the formal request for a refund) for the penalties corresponding to the Second and Fourth Quarters of 2000. Otherwise, the time limitation would have precluded a refund of those funds as well.

Quarter of 1999 because the Form 941, which was filed on September 15, 2003,[6] would have had to have been filed within two years from the date the penalty was paid for the Fourth Quarter of 1999, which was June 25, 2001.[7]

Subsequently, O'Neill and the Fund entered into an agreement in which O'Neill paid the actual tax penalty and the Fund agreed to cooperate with O'Neill in processing an appeal to the Internal Revenue Service. Decl. of Joshua Smeltzer, Government's Exhibit 102 at ¶¶ 1-2. The agreement provides that if the appeal were to be successful, the Fund would refund O'Neill up to the amount paid by O'Neill to the Fund. Id. at ¶ 3. Plaintiffs subsequently filed the present Complaint to recover the penalty in this Court.

Both parties have moved for the entry of summary judgment in their favor. The Commissioner argues that judgment should be granted in its favor because (1) O'Neill lacks standing to prosecute a claim for a refund and (2) Plaintiffs' claim is barred by the statute of limitations. Conversely, Plaintiffs argue that the May 8 and June 13 Letters expressly requesting a refund of the levy constitute valid informal claims for refund and, therefore, a claim for a refund was made before the required date. Plaintiffs alternatively argue that the common law mailbox rule should apply to allow the Court to presume that because the May 8 and June 13 Letters were mailed before the June 25, 2003 deadline, the statutory requirements have been met.

---

[6] The "Tax Due" stated on the letter accompanying the Form 941 that was filed lists the Fourth Quarter of 1999, the Second Quarter of 2000, and the Fourth Quarter of *2001*. However, the dates stated in all other papers filed by both parties, including the actual claim, indicate that the respective tax quarters were the Fourth Quarter of 1999 and the Second and Fourth Quarters of *2000*. Thus, the reference to the Fourth Quarter of 2001 appears to be a clerical error.

[7] Although some of the Plaintiffs' records indicate that the levy was taken on June 13, 2001, in its letter refusing to refund payment of the penalty for the Fourth Quarter of 1999, the Internal Revenue Service states that the tax was levied on June 25, 2001.

Finally, O'Neill argues that it has standing to bring the case because the statute conferring jurisdiction on the Court over tax matters, 28 U.S.C. § 1346(a)(1), must be interpreted broadly.

## II. DISCUSSION

### A. Jurisdiction

Subject matter jurisdiction over this dispute is conferred by 28 U.S.C. § 1346(a)(1), which provides that "district courts shall have original jurisdiction of . . . any civil action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority." Thus, if the Fund's claim was untimely filed pursuant to Section 6511 and 7422 of the Internal Revenue Code, the Court's jurisdiction over the claim may be extinguished. The burden of establishing the existence of federal jurisdiction over a claim for a tax refund falls on the taxpayer. Zabiegalski v. Comm'r of Int'l Rev., No. 93-0678, 1994 WL 178123, at *2 (M.D. Pa. Feb. 22, 1994).

### B. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing

the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

        C.     **Standing of O'Neill Consulting Corporation**

The United States argues that O'Neill does not have standing to bring the instant claim because the taxes at issue were paid via levy by the Fund and not by O'Neill. In turn, O'Neill argues that because it agreed to reimburse the Fund for the entire amount of the levy and will only recover the funds if the appeal is successful, standing is conferred because O'Neill holds the true risk of injury if the claim is denied.

In the Complaint, the Plaintiffs rely on Section 6511 of the Internal Revenue Code to assert that the Court has jurisdiction over this matter. Section 6511 states that a "[c]laim for credit or refund of an overpayment of any tax imposed by this title . . . shall be filed *by the taxpayer*." 26 U.S.C. § 6511 (emphasis added). A "taxpayer" is defined as "any person subject

to any internal revenue tax," and a "person" is to be construed "to mean and include an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. § 7701. The application of these statutory requirements is demonstrated in United States v. Williams, 514 U.S. 527 (1995).

In Williams, the Court addressed the question of standing in the context of the Internal Revenue Code. The plaintiff, who was the ex-wife of a taxpayer, paid a tax lien under protest to remove a lien from her property, and the Government argued that the plaintiff did not have standing to assert a claim because her ex-husband was the actual party liable to pay the taxes. Williams, 514 U.S. at 529. The Government argued that because the plaintiff was not a "taxpayer," i.e., was not the person liable to pay the taxes, she could not file a claim for a refund pursuant to Section 6511. Id. at 534.

The Court rejected this argument, reasoning that the only purpose of Section 6511(a) was to provide a deadline for filing administrative relief and was not intended to place a limit on who, as a "taxpayer," may file a claim. Id. Moreover, the Court noted that although the plaintiff was not liable for the taxes, she had actually paid them, and, that pursuant to Section 6402(a) of the Internal Revenue Code, a refund to "the person who made the overpayment" was authorized. Id. at 536. Significantly, however, the Williams Court limited its decision to the particular circumstances before it, noting that Ms. Williams had paid the taxes under protest to remove a lien from property that she owned, and that it was not deciding whether "a party who volunteers to pay a tax assessed against someone else may seek a refund under Section 1346(a)." Id. at 540.

Each of the parties in the case now before the Court relies on Williams to support their respective arguments. O'Neill argues that because it entered into an agreement with the Fund in

9

which it would pay the tax penalty and will only be repaid if the appeal is successful, it has standing because it will suffer an actual injury if the appeal is lost. The United States conversely argues[8] that the facts of this case are distinct from Williams because O'Neill did not pay the levy under protest but rather voluntarily agreed to pay on behalf of the Fund as part of a settlement agreement.

Although several courts within the Third Circuit have cited to Williams, none have addressed the issue presented here. In one case, decided the year before Williams, a district court within the Third Circuit concluded that a sole owner of the capital stock of a corporation who was told by a revenue officer that she was personally liable to pay the corporation's taxes was allowed standing to file for a refund of the monies. See Barris v. United States, 851 F. Supp. 696, 698 (W.D. Pa. 1994). The Barris court acknowledged a split between the circuit courts in construing Section 6511, and concluded that because the statute merely imposed a limitation on the time within which a claim could be filed, the use of the term "taxpayer" did not constitute a

---

[8] In support of this argument, the United States points to two other district court cases in which third party payers were precluded from filing tax claims. In MMR Corp. v. United States (In re MMR Holding Corp.), No. 98-357, 2000 U.S. Dist. LEXIS 17723 (M.D. La. Oct. 27, 2000), the court concluded that the plaintiff, MMR Holding Corporation, did not have standing to file a claim for a refund of a tax debt the company had paid on behalf of one of its officers. In so holding, the court noted that the case was distinguishable from Williams in that no lien, levy or other action had been taken against the corporation or its property.

Similarly, in Mobile Med. Support Svcs, Inc. v. United States, No. 98-1029, 2000 U.S. Dist. LEXIS 15564 (D. Conn. Sept. 12, 2000), the court held that a corporation which paid employment tax liabilities on behalf of two related corporations did not have standing to file a claim for a refund because there was no evidence that the taxes were paid under protest or that the corporation's action was anything other than voluntary. That court concluded that under the Williams limitation, the corporate payer had no standing to file a claim.

Neither of these cases have yet been cited by a court within the Third Circuit.

limitation on standing. Id. As such, the court refused to dismiss the claim because the plaintiff alleged that she had paid the taxes based on a mistaken belief that she was personally liable.

The Court finds the circumstances presented here to be distinct from those in either Williams or Barris. From the record presented it is clear to the Court that O'Neill knew that the Fund, and not O'Neill, was actually liable to pay the taxes but voluntarily agreed to pay them on behalf of the Fund pursuant to the terms of the agreement. The existence of the agreement suggests that O'Neill recognized that its error was the source of the delay in discovering the levy. Thus, the essence of the agreement is rooted in O'Neill's business decision to anticipate its potential professional liability obligation to cover the expense to the Fund, and does not suggest that O'Neill erroneously or otherwise believed it bore any obligation to the Internal Revenue Service. In fact, the payment that O'Neill made was to reimburse the *Fund*, and not the *Internal Revenue Service*. Although the agreement refers to the fact that the Fund would be appealing the levy, because there was no actual payment by O'Neill to the Internal Revenue Service, it is difficult to construe the payment as one made in protest. Because the liability in question in this case is not that of O'Neill, and there is no evidence that O'Neill involuntarily made reimbursement to the Fund for the levy, the Court concludes that O'Neill does not have standing to bring this case. Therefore, judgment in favor of the United States will be entered with respect to O'Neill.

      D.    **Timeliness of Request for Refund**

The United States argues that because the Fund did not submit a timely formal claim for a refund, and because the Fund cannot prove the date of delivery for the May 8th and June 13th

informal letter requests,[9] any refund request was untimely, thereby removing the Court's authority to adjudicate this claim.

To seek a refund of overpaid taxes, a taxpayer must file a timely claim for a refund pursuant to 26 U.S.C. § 6511. C.I.R. v. Lundy, 516 U.S. 235, 239 (1996). Section 6511 provides that a "[c]laim for credit or refund of an overpayment of any tax imposed by this title in

---

[9] In its Memorandum in Support of the Motion for Summary Judgment, the United States asserts that the May 8 and June 13 Letters are only alleged to be informal claims for a refund. United States Memorandum at 10.

In certain circumstances, a written document may be construed as an informal request for a tax refund. United States v. Kales, 314 U.S. 186 (1941). In Kales, the plaintiff filed a "written protest" of a tax assessment within the allowable statutory period, and nearly three years later filed a "formal claim" for refund of the taxes that was stated to be an amendment of her prior claim. Kales, 314 U.S. at 191. In holding that the original "written protest" was to be considered a claim for a refund, the Court noted that the circumstances of the case supported such a finding. Id. at 196-97.

To be treated as an informal claim for a refund, a document must be a writing "which informs the administrative agency that the taxpayer believes that he has been subjected to an erroneous or illegal tax exaction, and that he desires a refund or credit because of such action." Damelio v. United States, 679 F.2d 313, 315 (3d Cir. 1982) (concluding that letters that failed to advise the government "that [the plaintiff] believed it was entitled to a refund" were not sufficient to establish a formal claim). A taxpayer seeking to have their communication treated as an informal claim "must inform the Internal Revenue Service that a claim for a refund is being asserted, and must provide enough information so that the IRS can adequately examine the merits of the claim." Evans v. United States, 618 F. Supp. 621, 622-23 (E.D. Pa. 1985), aff'd, 787 F.2d 581 (3d Cir. 1986). In following Kales, courts within the Third Circuit have held that the written component of an informal claim must be evaluated in the context of all of the surrounding circumstances of a particular case, and that "the adequacy or sufficiency of an informal refund claim is primarily a question of fact." Estate of Tinari v. United States, No. 97-1974, 1998 WL 720156, at * 2 (E.D. Pa. Sept. 11, 1998).

Here, in the May 8 Letter, Plaintiffs state their belief that the tax assessment was erroneous and that a refund should be forthcoming. In the June 13 Letter, Ms. O'Neill states that she is "anxious to resolve this matter *and have the money returned to this Fund as quickly as possible*." For purposes of the argument set forth by the United States, the Court hereby concludes that the May 8 and June 13 Letters were informal requests for a refund of the levy.

respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." 26 U.S.C. § 6511(a). Section 6511 also states that "[n]o credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in subsection (a) for the filing of a claim for credit or refund, unless a claim for credit or refund is filed by the taxpayer within such period." 26 U.S.C. § 6511(b). Thus, a refund suit that is not timely filed under the provisions of 26 U.S.C. § 6511(a) must be dismissed. See Krieger v. United States, 539 F.2d 317, 320 (3d Cir. 1976).

The United States argues that because the Fund did not file a formal claim for a refund until September 15, 2003, the claim was untimely filed.[10] The United States further asserts that the May 8 and June 13 Letters cannot be considered timely filed because the United States has no record of ever having received the letters and the Fund cannot, pursuant to the exceptions set forth in Section 7502 of the Internal Revenue Code, provide proof of actual delivery of the letters.

In response, Plaintiffs present a two-pronged argument. Plaintiffs first argue that Section 7502 does not preclude their letters from being considered appropriate requests for a refund because that provision applies only when a claim is delivered *after* the prescribed date, and that both the May 8 and June 13 letters would have been received well prior to the June 25 deadline. Plaintiffs secondly argue that the common law "mailbox rule," under which a letter that is shown to be properly mailed is presumed to be received by the addressee, has not been displaced by the

---

[10] As stated above, the levy was taken by the United States on June 25, 2001. Thus, Section 6511 requires that any claim for a refund of the levy must have been filed on or before June 25, 2003.

specific statutory requirements and would apply here.

1.  **Applicability of Section 7502**

Acknowledging that in some instances, refund claims have been mailed before a specific deadline but received afterward, the Internal Revenue Code provides statutory guidance to determine timeliness of filing.  Section 7502 of the Internal Revenue Code states that "[i]f any return, claim, statement or other document required to be filed . . . within a prescribed period or on or before a prescribed date . . .is, after such period or such date, delivered by United States mail to the agency, officer or office with which such . . . claim . . . is required to be filed, . . . the date of the United States postmark stamped on the cover in which such return, claim, statement, or other document, or payment, is mailed shall be deemed to be the date of delivery . . . ." 26 U.S.C. § 7502(a)(1).  This rule applies only if "the postmark date falls within the prescribed period or on or before the prescribed date . . . for the filing . . . of the . . . claim" and "the . . . claim . . . was, within the time prescribed . . . deposited in the mail in the United States in an envelope or other appropriate wrapper . . . properly addressed to the agency, officer, or office with which the return, claim, statement or other document is required to be filed . . . ." 28 U.S.C. § 7502(a).

Section 7502(b) states that the timely mailing rule "shall apply in the case of postmarks not made by the United States Postal Service only if and to the extent provided by regulations prescribed by the Secretary." 26 U.S.C. § 7502(b).  In turn, the regulations corresponding to this portion of the statute state that:

> If the postmark on the envelope is made other than by the U.S. Postal Service – (i) the postmark so made must bear a legible date on or before the last date, or the last day of the period, prescribed for filing the document or making the payment,

> and (ii) *the document or payment must be received* by the agency, officer or office with which it is required to be filed not later than the time when a document or payment contained in an envelope that is properly addressed, mailed, and sent by the same class of mail would ordinarily be received if it were postmarked at the same point of origin by the U.S. Postal Service on the last date, or the last day of the period, prescribed for filing the document or making the payment.

26 C.F.R. § 301.7502-1(c)(3)(B) (emphasis added). The explicit language of this regulation suggests that unless a document is stamped with a United States Postal Service postmark, the postmark date will not be determinative of the document's receipt. There are only two apparent exceptions to the requirement of actual delivery set forth in Section 7502(b). The first exception is the one provided for in Section 7502(a), as stated above, and the second, set forth in Section 7502(c), allows for documents sent by registered mail to be considered "prima facie evidence that the . . . claim . . . was delivered to the agency, officer, or office to which addressed." 26 U.S.C. § 7502(c).

The present case is unique in that although the Plaintiffs assert that the May 8 and June 13 Letters were mailed and postmarked prior to the June 25, 2003 deadline, there is no evidence that the documents were actually received by the Internal Revenue Service.[11] Before the enactment of Section 7502, the general rule respecting the filing of documents with the Internal Revenue Service was that no filing was complete until the document was delivered and received. Bazargani v. United States, No. 91-4709, 1992 WL 189399 at * 2 (E.D. Pa. Jul. 29, 1992) (citing United States v. Lombardo, 241 U.S. 73, 76 (1916)). Section 7502 was enacted to alleviate the harshness of this "physical delivery" rule. Id. Thus, the Plaintiffs' argument that Section 7502, which provides opportunity for exception to the physical delivery rule, does not support the

---

[11] The United States avers that it has no record of ever receiving the letters.

Plaintiffs.

## 2. **Common Law Mailbox Rule and Extrinsic Evidence**

The common law mailbox rule provides that a letter that is shown to be properly mailed is presumed to be received by the addressee. United States v. Lansdowne Swim Club, 713 F. Supp. 785, 819 (E.D. Pa. 1998) (considering civil rights claim). While Plaintiffs argue that this rule was not displaced by Section 7502, the Court disagrees.

The Court of Appeals for the Third Circuit has not directly stated that the common law mailbox rule was displaced by Section 7502.[12] However, in several cases that have been decided since its enactment, courts within the Third Circuit have interpreted Section 7502 in a manner suggesting such displacement.[13] For example, in Boccuto v. Comm'r of Int'l Rev., 277 F.2d 549,

---

[12] There is disagreement on this issue among other circuit courts of appeal. Courts within the Eighth, Ninth and Tenth Circuits have concluded that notwithstanding Section 7502, extrinsic evidence may be considered to determine whether a taxpayer mailed his return or claim. See Sorrentino v. I.R.S., 383 F.3d 1187, 1193 (10th Cir. 2004) (noting that the statutory language of Section 7502 does not explicitly abolish the mailbox rule and, therefore, Congress did not intend for such); Anderson v. United States, 966 F.2d 487, 490-91 (9th Cir. 1992) (noting that Section 7502(c) is not the only exception to the statutory mailbox rule and allowing testimony that plaintiff saw postal clerk stamp the document with the appropriate postmark date); Estate of Wood v. Comm'r of Int'l Rev., 909 F.2d 1155, 1161 (8th Cir. 1990) (looking to legislative history of Section 7502, concluding no intent to abrogate mailbox rule and affirming allowance of testimony by post office employee that document was postmarked within the deadline despite plaintiff's inability to meet requirements of Section 7502). Conversely, the Courts of Appeal for the Second and Sixth Circuits have adopted the position that Section 7502 provides the only explicit exceptions to the actual delivery rule. See Miller v. United States, 784 F.2d 728, 731 (6th Cir. 1986); Deutsch v. Comm'r of Int'l Rev., 599 F.2d 44, 46 (2d Cir. 1979) (citing to Boccuto for proposition that extrinsic evidence is not admissible after enactment of Section 7502).

[13] The Court notes that in a somewhat related case, the court has concluded that taxpayers were entitled to be given the opportunity to prove what an illegible date on a United States postmark actually was, and that the exceptions to the rule requiring actual delivery to the Internal Revenue Service are explicitly set forth in Section 7502 and a plaintiff must be bound by the actual delivery rule unless he or she fits within one of these exceptions. See Skolski v. Comm'r of Int'l Rev. Svc., 351 F.2d 485, 487 (3d Cir. 1965). However, Skolski is not determinative here.

16

553 (3d Cir. 1960), the court stated in dicta[14] that "Congress has explicitly set forth the allowable exceptions to the rule of actual receipt by the Tax Court within the specified time," and noted that "[u]nless a taxpayer can fit himself within one of the statutory exceptions, he is bound by this rule." Subsequently, in Bazargani v. United States, No. 91-4709, 1992 WL 189399 at * 2 (E.D. Pa. Jul. 29, 1992), although the plaintiff asserted that she mailed her tax return in time for it to be delivered on or before the statutory deadline of April 15, 1983, the Internal Revenue Service asserted that it never received the return. The plaintiff submitted a copy of the return, postmarked June 13, 1983, and was thereafter charged a penalty for late filing. Id.

Rejecting the plaintiff's argument that the common law mailbox rule applied to deem her original filing as timely, the Bazargani court interpreted the Boccuto dicta to mean that the common law mailbox rule was displaced by Section 7502 and that, absent proof of having mailed the return by registered or certified mail, the court could only conclude that the return had been submitted on the date of the postmark reflected on the copy received by the Internal Revenue Service, which was June 13, 1983. Similarly, in Poindexter v. Internal Revenue Service, No. 96-4404, 1998 WL 424462 at * 3 (E.D. Pa. Apr. 29, 1997), the court concluded that the only exceptions to the general physical delivery rule are those stated in Section 7502, and that absent proof of a postmark, registration or certification, the date that the Internal Revenue Service

---

Although the Plaintiffs might assert that they could present evidence that Mr. Dugan did receive the letters, there is no proof of receipt of either of the letters and no postmarked envelope to examine. Absent this information, which is required under the exceptions set forth in Section 7502, such evidence would not be determinative.

[14] In the case before it, the Boccuto court concluded that because the regulations implementing Section 7502 had not been published at the time of the facts relevant to the case, the section was not applicable. Boccuto, 277 F.2d at 552-53.

received a claim is the date that the claim is deemed to have been filed.

Viewing the present facts through the lens of this reasoning, the Court is left with little other choice than to conclude that absent proof of having sent the May 8 or June 13 Letters by registered or certified mail, the physical delivery rule applies. Here, the Plaintiffs did not submit the letters by either registered or certified mail, and there is no evidence that either of the letters was received at all by the Internal Revenue Service. Even assuming as true the Plaintiffs' assertion that they spoke with Mr. Dugan both before and after mailing the letters, this evidence is not sufficient to comply with the requirements of the statutory exception to the physical delivery rule. Because there remain no disputed questions of material fact from which a reasonable person could conclude that the May 8 and June 13 letters were not mailed pursuant to the exceptions set forth in Section 7502, summary judgment will entered in favor of the United States.

**CONCLUSION**

For the reasons discussed above, the Plaintiffs' Motion for Summary Judgment will be denied and the United States' Motion for Summary Judgment will be granted. An appropriate Order follows.

S/Gene E.K. Pratter
Gene E.K. Pratter
United States District Judge

July 17, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILADELPHIA MARINE** | : | **CIVIL ACTION** |
| **TRADE ASSOCIATION/** | : | |
| **INTERNATIONAL** | : | |
| **LONGSHOREMEN'S** | : | |
| **ASSOCIATION VACATION** | : | |
| **FUND, et al., O'NEILL** | : | |
| **CONSULTING CORPORATION,** | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| **UNITED STATES,** | : | |
| Defendant. | : | No. 04-4857 |

**O R D E R**

**AND NOW,** this 17th day of July, 2006, upon consideration of the Motion for Summary Judgment of the United States (Docket No. 15) and the Motion for Summary Judgment of the Plaintiffs Philadelphia Marine Trade Association and O'Neill Consulting Corporation (Docket No. 16), the responses thereto (Docket Nos. 17, 18) and after hearing oral argument on the motions, it is **ORDERED** that the Motion for Summary Judgment of the United States is **GRANTED** and the Motion for Summary Judgment of the Plaintiffs is **DENIED**.  It is **FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of defendant United States of America and shall mark this case as closed.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge